## Strode, Executrix, etc. v. Strode.

(Decided May 5, 1922.)

### Appeal from Fayette Circuit Court.

1. New Trial—Discretion of Court.—In the granting of new trials the court has a broad discretion, and its action in doing so will not be interfered with by this court unless it clearly appears that such discretion has been abused, since this court will interfere in such cases with greater reluctance than when the court overruled the motion for a new trial; but that rule is one more of admonitory caution to the appellate court than an enlargement of power in the trial court.

2.   New Trial—Discretion of Court—Setting Aside Order—Reinstating.—What are the limits of a "broad discretion," as applied to the power of the trial court to grant a new trial, and what constitutes "an abuse of such discretion" are questions difficult of definition, but, whatever the correct definition may be, if it appears that in granting the new trial the court violated the fundamental rules of practice it committed an abuse of discretion, and when it is done solely upon the insufficiency of the evidence to support the verdict and the testimony is equiponderant, or nearly so, this court will set aside the order and reinstate the verdict when the record properly presents the question.

3.   Evidence—Expert Testimony.—Expert testimony is considered among the weakest class and will be received and weighed with great caution.

4.   Wills—Abuse of Discretion in Setting Aside Verdict Finding Will Genuine.—Where the issue was whether a holographic will was genuine or spurious, and the evidence was as much in favor of its genuineness as that it was counterfeit, the court abused its discretion in setting aside a verdict finding it to be genuine; and upon appeal from a second and contrary verdict the judgment will be reversed with directions to reinstate the first verdict and render judgment thereon.

GEO. C. WEBB, W. A. BYRN, W. P. KIMBALL, JAS. H. HAZELRIGG, E. C. O'REAR, O. S. HOGAN, W. G. DEARING and WILFORD JESSUP for appellants

PENDLETON & BUSH, HUNT & BUSH and ALLEN & DUNCAN for appellee.

OPINION OF THE COURT BY JUDGE THOMAS—Reversing.

This appeal involves the question of whether a paper dated May 14, 1910, is the last will and testament of J. W. Strode, deceased. It was probated as such by the county court of Fayette county at the instance of his widow, Irene B. Strode, the appellant and contestee below, who is the only devisee and legatee therein and who, by its terms, is made executrix thereof. An appeal from that judgment was prosecuted to the Fayette circuit court by the appellee and contestant below, W. D. Strode, the father and only heir of decedent, his mother being dead, and he and appellant not having any children, though they were married in 1900 and lived together till the decedent's death, which occurred at his home in Fayette county on September 10, 1915.

The paper in question is holographic, and it gave to appellant the residence and 250 acres of land around it, half of decedent's property in Lexington and all of his

personal property. The only ground of contest is that it was not written or signed by J. W. Strode, which inferentially says it is a forgery. It is admitted that if it is genuine the testator possessed sufficient mental capacity to make it and that he was not unduly influenced to do so. At a trial had in the Fayette circuit court there was a verdict on March 9, 1916, finding it to be the last will and testament of J. W. Strode. Judgment was pronounced on that verdict, but a motion for a new trial filed in due time by appelle was sustained, and the verdict and judgment were set aside, to which ruling appellant objected and excepted and obtained leave to file bills of exception and preserve the evidence heard upon that trial, which we shall hereafter refer to as "the first trial." The court, in granting the new trial, assigned no reasons therefor, the order only reciting that "said motion is sustained and the verdict of the jury and the judgment entered thereon are hereby set aside."

A second trial resulted in a verdict returned on December 5, 1919, finding the paper in contest not to be the last will and testament of the decedent upon which judgment was accordingly rendered, and on the next day appellant individually, and as executrix, entered motion to set aside the last verdict and to set aside the order granting a new trial at the first hearing and render judgment upon the verdict returned at the first trial, which motion was overruled with exceptions, whereupon she filed her motion for a new trial, including therein as one of the grounds the refusal of the court to sustain her motion for a judgment upon the first verdict. That motion was overruled and she has appealed, her counsel relying exclusively for a reversal upon the error of the court in setting aside the verdict returned at the first trial, it being conceded that there is such a conflict in the testimony heard upon the last trial as to sustain a verdict either way, and that no other material errors occurred at that trial.

The question is, therefore, narrowed to the single proposition whether there was such an abuse of discretion by the trial court in granting the new trial upon the first hearing as will authorize us to reverse the judgment therefor, and to direct the entry of one upon that verdict? That such a practice is allowable and frequently exercised in a proper case is admitted, and this court is no exception to those recognizing and adopting it, as will be seen from the cases of C. & O. R. R. Co. v. Salyers, 187 Ky. 144; College of Dentistry v. Hartford Steam Boiler In-

spection and Insurance Co., 185 Ky. 778; Gullett's Admr. v. C. & O. R. R. Co., 182 Ky. 400; Dailey v. L. & E. R. R. Co., 180 Ky. 668; Ross v. Kohler, 163 Ky. 583, L. R. A. 1915D 621; Perkins v. Ogilvie, 148 Ky. 309; Nolan's Admr. v. Standard Sanitary Mfg. Co., 33 Ky. L. R. 745; Anderson v. Republic Iron & Steel Co., 32 Ky. L. R. 723; Crawley v. L. & N. R. R. Co., 21 Ky. L. R. 1434; Richards v. L. & N. R. R. Co., 20 Ky. L. R. 1478; Meek v. Patton, 12 Ky. L. R. 796, and numerous others referred to in them. See also as to the general rule 4 Corpus Juris, 833-834. The substance of the prevailing practice, as set forth in the cases and authority referred to, is that a court of review will more reluctantly interfere with the action of the trial court in granting a new trial than in refusing one, but that the authority to grant a new trial is not an arbitrary one, and it can be exercised only within the sound discretion of the court, and if on appeal it appears that the court abused such discretion his action in granting a new trial will be reversed with directions to enter judgment upon the verdict erroneously set aside. If a new trial is granted, the losing litigant is still left in court with the right to a full presentation and hearing of his cause in the future, while if the motion is overruled his involved rights are fixed and finally determined and adjudicated. It is because of these divergent consequences that appellate courts are more reluctant to interfere in the one case than in the other; but after all the distinction is one more of admonitory caution to the appellate court than an enlargement of the power and discretion of the trial court, for, as will be seen, appellate interference, when a new trial is granted, is exercised only when the error "clearly appears," *i. e.*, when the reviewing court after exercising the proper caution is thoroughly convinced.

The practice in this court as so circumscribed, is thus stated in the opinion in the Salyers case, *supra*: "Conceding, that in the matter of granting a new trial, the trial courts have a wide discretion, and this court will not interfere with that discretion, unless it has been abused, to set aside a verdict and judgment when there is no error in the trial, and where there is no other good reason for so doing, is, of course, an abuse of discretion by the trial court, and this court has often asserted its right to correct erroneous rulings of the circuit court, in granting a new trial. To authorize us to do so, however, it must be clearly shown that the trial court has abused its

discretion. It is well established, that if a circuit court erroneously grants a new trial, and the party excepts to the rulings, and when another trial is had will move the court to set aside the last verdict and judgment, and to substitute the one formerly erroneously set aside, and his motion is overruled, upon appeal to this court, the order, granting the new trial, will be reviewed, and if found erroneous, the latter judgment will be reversed, and the trial court directed to enter, in its stead, a judgment upon the verdict erroneously set aside. Perkins v. Ogilvie, 148 Ky. 209; Ross v. Kohler, 163 Ky. 583; Nolan's Admr. v. Standard Sanitary Mfg. Co., 111 S. W. 293; Meek v. Patton, 12 K. L. R. 796; Richards v. L. & N. R. R. Co., 20 K. L. R. 662; Curry v. Fetter, 15 K. L. R. 494; L. & N. R. R. Co. v. Ricketts, 21 K. L. R. 662.''

The opinion in the Nolan case, after stating the broad discretion lodged with the trial court in the matter of granting new trials and the reluctance of this court to interfere therewith, says: ''While the appellate courts are slow to disturb the action of the lower court in granting a new trial, they will do so when it plainly appears, as it does in this case, that there is no good reason why a new trial should have been granted.'' It could serve no useful purpose to incorporate herein a statement of the facts in all of the cases referred to, nor to insert further excerpts from the opinions, since the right in a proper case to reinstate the verdict erroneously set aside is well established, and indeed conceded.

The principal ground upon which the order setting aside the first verdict is sought to be upheld is the insufficiency of the evidence heard upon the first trial to sustain that verdict. Other grounds were relied on in the motion therefor, three of which are referred to in briefs of appellee's counsel, but our examination of the record convinces us that none of the latter possess merit. Indeed, counsel seem to so concede, since they are but slightly pressed. Those three additional grounds are: (a), that the court admitted incompetent evidence offered by appellant, the propounder of the will; (b), because the court did not allow sufficient time for William G. Pengelly, an expert witness introduced by appellee, to give his testimony, and (c), because the court limited the number of witnesses each side should introduce and refused to permit five additional witnesses offered by appellee, to testify at that trial. Grounds (a) and (b) are

wholly unfounded, the record furnishing no basis whatever therefor. Ground (c) is likewise untenable for, if it be conceded that the court erred in limiting the witnesses, it is recited in the bill of exceptions, which the court signed, that "An agreement was made by which it was stipulated that the following witnesses would testify, if permitted, to the same facts as J. E. McFarland, to-wit," and then follow the names of the offered witnesses who were not allowed to take the stand. McFarland had given it as his opinion that the paper in contest was not in the handwriting of the decedent and assigned his reasons therefor, and the jury under the agreement were permitted to consider the testimony of the offered witness as being the same as his, all of which was done by agreement and of course may not be successfully complained of by either party. This leaves as the only *possible* ground justifying the court's action in setting aside the verdict on the first trial, that it was not sustained by sufficient evidence, the disposition and determination of which calls for a brief statement of the testimony heard upon the first trial, as well as the circumstances affecting the issue then involved.

In addition to what has already been stated it appears that the decedent owned at the time of his death four hundred and eighty-three (483) acres of land in Fayette county located near the Kentucky river dividing that county and Jessamine, and it was not, therefore, the finest quality of land in the county of his residence. At the time of his marriage he owed nearly all the purchase price of his land amounting to some $10,000.00 or more, which his wife, through her labors in the household as well as work in attending to a country store, helped to pay, and she further helped him to accumulate other property besides. He likewise owned some real estate in the city of Lexington, but the nature and value of which is not shown, and he died possessed of personal property of the value of as much as $6,000.00.

The paper in contest is written in pencil and on a sheet of a blank ledger made of very inferior paper. The widow, within a few days after her husband's death, believing, as she had frequently stated, that he left no will, qualified as his administratrix, and by October 18, 1915 (which was one month and eight days after his death), she had made considerable progress in winding up his estate, a part of which was a public sale of his personal property. On the day mentioned, she and a col-

ored servant were cleaning out a closet under a stairway running up from the living room of their residence and in which her husband kept his clothing, some market reports and other papers which he saw proper to preserve, and also kept on a shelf therein a box of medicine which he administered to any of his stock that might become afflicted. After the medicine was taken from the box it was removed and immediately under a newspaper upon which it was resting a sealed envelope was found with appellant's name written thereon. It was opened and found to contain the paper in contest. Appellant recognized it as being the handwriting of her husband, but to thoroughly satisfy herself she carried it to Mr. Threlkeld, the cashier of the Phoenix and Third National Bank of Lexington, Kentucky, with which her husband did business, and he and the bank's teller, Mr. Freeman, pronounced the paper as being in the handwriting of J. W. Strode. Accordingly, they and appellant went before the county court and probated it upon the testimony of Threlkeld and Freeman.

At the first trial in the circuit court about nine witnesses testified in favor of the genuineness of the contested paper, while about the same number testified to the contrary, and in the latter list was Freeman, upon whose testimony the county court probated the will, and who stated in the circuit court that he had changed his mind. Among the list of witnesses who testified for contestant was an expert from Columbus, Ohio, who acknowledged that he was receiving for his services as a witness his expenses and $100.00 per day. Of the number who testified in favor of the genuineness of the will many of them had seen the decedent not only write his name but had seen him write other papers and documents besides, while a much less number of witnesses testifying on the other side had seen him do any writing, and perhaps none of them had seen him do more than write his name. So that, we feel that we might safely conclude that the witnesses who testified for the contestee showed themselves upon the whole to be the better qualified. The expert, like all of his class, pointed out what he conceived to be discrepancies between the writing forming the will and that of other papers and documents, which are admitted to be genuine and were introduced for purposes of comparison. He particularly dwelt upon the formation of the small letters "b" and "r," and the capital letters "J" and "S" found in the will, and it must be admitted

that at least the greater number of those letters found in the will are different from most of them found in the other writings, but, in the latter writings there are found some of the same letters of the same form and shape as those found in the will. It is shown that in the will there are a few misspelled words, but in some of the other genuine writings introduced at the trial there are also found some misspelled words. It is also pointed out by the expert, and perhaps one or two other witnesses for contestant, that the whole writing of the will appears to have been made with a finger movement and to have been nervously written, while, as insisted, the compared papers appear to have been written with a muscular movement and with greater ease. But, be this as it may, we know from observation and experience that no one can produce an exact *facsimile* of his writing upon any two different occasions. Many elements enter into the creation of the differences, such as the character of paper, whether written with pen or pencil, and if the latter, whether it was sharp or dull, the position of the writer and of the paper at the time, as well as the physical condition and mental attitude of the writer toward the thing being written.

Of the parol testimony heard upon the first trial the utmost that may be said is that there was no preponderance either way, which is to ignore the contradictory attitude of the witness, Freeman, and the referred to superior opportunities of contestee's witnesses to become familiar with and know the handwriting of the decedent; and we are by no means prepared to say that the testimony of the expert witness (who, strange to say, did not testify on the last trial, nor was his former testimony offered to be read), resolved the doubt either the one way or the other. Such testimony, as has often been held, is of the weakest character and should be received and weighed with great caution (Ky. Traction & Terminal Co. v. Humphrey, 168 Ky. 611), for the witness is not only most generally biased toward the side employing him, but his opinions are based, not upon facts within his knowledge, but upon what may be told or shown to him by others. The "standard" papers, introduced for comparison, are brought up with the record and we have closely inspected them in conjunction with the paper in contest, particularly those written in pencil, and while we observe some of the defects pointed out by the expert and some of the other witnesses, yet no one can make the

comparison without concluding that the general appearance of the writings is the same, and a casual observer would no doubt unhesitatingly pronounce them as executed by the same person.

Aside from the above testimony, there are some circumstances in the case, which point strongly to the genuineness of the contested paper. Perhaps the one of least importance is that on the day it was written the decedent had visited at Winchester, Ky., an uncle to whom he was very much attached, and had returned home no doubt with the belief that he would not live, which proved true because he died the next day. The paper must have been written that night when the testator was distressed and disturbed and when he was fully impressed with the fact of the uncertainty of life, since his uncle had been suddenly attacked. He had expressed on a number of occasions his intention to execute a will in favor of his wife, and there is no circumstance shown in the case why he would not want her to share all, or at least the greater portion of, his property, since she had helped him to acquire it. That the wife did not herself forge the will is not only shown by her repeated statements that her husband left no will, but strongly by the fact that she proceeded to wind up his estate as though he was intestate, and actually sold some of the property which the paper, if genuine, devised to her. Surely no other person would forge the paper without the wife's knowledge or consent, and if she is guilty it is passing strange that she would write such a long document and take unto herself only a portion of her husband's property when only a far less number of words would have been required to devise and bequeath to her all of it. None of the handwriting of appellant was introduced for the purpose of showing any similarity between it and the paper in contest. The irresistible conclusion to be drawn from all the facts and circumstances proven in the case, without taking further time or space to enumerate them, is, according to our view, more favorable to the genuineness of the paper than against it.

Under such circumstances did the court abuse its discretion in setting aside the first verdict so as to call for the application of the rule of practice, *supra?* Fully realizing that a larger discretion will be allowed the trial court in the granting of a new trial than in refusing one, for the reason and within the limitations hereinbefore stated, we are still called upon to determine what is in-

cluded within the meaning of the phrase "the exercise of a sound discretion" within that rule, or conversely stated, what would constitute "an abuse of discretion" so as to authorize this court to direct the reinstatement of the first verdict? Evidently, each case must be determined upon its own peculiar facts and circumstances; but, whatever may be the true circumscribing limits of the terms referred to, we are satisfied that it was never intended to be announced by this or any other court as a sound doctrine that a trial court exercises "a sound discretion," with no authority to interfere by a reviewing court, in granting a new trial for insufficiency of evidence to support the verdict when it was equiponderant (or nearly so) and the finding of the jury would be undoubtedly proper and sustainable if rendered either way. Clearly, in that case, there is an abuse of discretion within the rule and the duty of the reviewing court to interfere by exercising its authority arises. A contrary holding would lodge with the trial court the power to retain a case on the docket indefinitely, or until a jury could be found which would return a verdict in accordance with its conception of the facts, notwithstanding the evenly balanced condition of the testimony. Such a discretion, if possessed by the court, would not only be an unwarranted encroachment upon the proper and legitimate functions of the jury, but it would tend to delay the final disposition of causes, not to mention the arbitrary power with which it would vest trial courts. So that, howsoever much further the authority of this court may extend in such cases, we feel that it may be safely said that when the evidence and proven circumstances are equiponderant in convincing effect it is an abuse of discretion by the trial court to set aside the verdict. However, in this case, as we have briefly attempted to show, the evidence upon the first trial was more convincing as to the genuineness of the paper in contest than that it was spurious.

It results, therefore, that the court erred in failing to sustain the motion on the last trial to reinstate the first verdict and render judgment thereon. Wherefore, the judgment is reversed with directions to proceed in conformity with this opinion.